Moncure P.
This is an action of debt brought by the Bank of the Old Dominion against James H. McVeigh and Edgar McVeigh, late copartners trading under the firm name of J. H. McVeigh & Son, and William 1ST. McBeigh, as drawers and endorser of *787 seven protested negotiable notes, amounting together to the principal sum of sixteen thousand five hundred dollars. The action was brought on the 18th day of August 1870, in the Corporation court of the city of Alexandria. Process was executed and rules taken regularly, against the defendants James H. McVeigh •and William if. McVeigh; but not against Edgar MeVeigh, as to whom the process was several times returned “not found,” and “no inhabitant;” and after, the cause had been for some time continued at rules for service as to him, it appears that on the first Mon-Jay in March 1871, on the motion of the plaintiff, an order was made to abate the suit as to the said Edgar McVeigh; though it appears from the record that on a previous day, to wit:, on the 10th day of October 1870, the cause was docketed as to all the defendants, including the said Edgar McVeigh. The defendants pleaded nil debet and payment, on which issues were joined, which came on to be tried in July 1871, when the jury found a verdict for the plaintiff, in the sum of $12,828.55, with interest from January 1, 1866, on which verdict a judgment was thereupon rendered by the court; to which judgment, on the petition of the defendants, a writ of error was awarded by this court: and that is the case we now have under consideration.
The errors complained of, if they exist, appear in two bills of exceptions taken by the defendants to certain rulings of the court in the cause. The first presents a single question. The second presents all the other, and the most important, questions arising in the cause, and will be at once considered.
The second bill of exceptions of the defendants states, that on the trial of the cause, the plaintiff, to maintain the issues on its part, gave in evidence to the jury, seven promissory negotiable notes, drawn by *788 James H. McVeigh & Son, and endorsed by William McVeigh, which notes are set out, in hcec verba, in the bill of exceptions, also the notarial certificate of Protest of the said notes, which certificates are also set out in hcec verba, in said bill. The plaintiff then proved that James H. McVeigh and Wm. N. McVeigh wer6j on ^0 goth day of May 1861, residents of the city of Alexandria; that after the Federal forces occupied the city of Alexandria, on the 24th day of May 1861, the said James H. and Wm. U. McVeigh, on the 30th of May 1861, left their residences in the city of Alexandria, and went in the Confederate lines, where their families were on a visit; that said Wm. U. McVeigh left at his residence in Alexandria, a white servant and all his furniture, and left also his books and papers at the banking-house of the Bank of the Old Dominion, of which bank he was president; that Wm. N. McVeigh did not resign his office; did not formally notify the directors of his intended absence; that the officers of said bank, however, knew that said Wm. hi. McVeigh had left Alexandria, and whilst within the Confederate lines, he was, in 1862, reelected president of said bank; that Robert Crupper was the confidential clerk and attorney of James II. McVeigh & Son, and that the power from them to said Crupper, authorizing him to draw and endorse notes and checks in their absence, was deposited in the Bank of the Old Dominion; that Wm. H. McVeigh knew of Crupper’s agency; that he had been, prior to the war, in the habit of intrusting his signature in blank with James H. McVeigh & Son, and that he had left said blanks with said McVeigh & Son, and that the same were left by McVeigh & Son in the hands of Robert Crupper when McVeigh & Son left Alexandria; that Wm. U. McVeigh, just before leaving Alexandria in May 1861, *789 requested Eobert Crupper to take care of bis property, meaning thereby his real estate; that in June 1863, the said Eobert Crupper, claiming to act as the agent of Wm. E. McVeigh, with the bank book of Wm. E. McVeigh in his possession, went to W. H. Lambert, the cashier of the Bank of the Old Dominion, and demanded of him four notes of Wm. Cogan, each for $500, which had been, prior to the war, deposited with said bank by W. E. McVeigh for collection, and entered on his said bank book; that said plaintiff had previously refused to accept payment of said notes from Wm. Cogan in Virginia currency, because he was not authorized by Mr. McVeigh to do so, and because a rule of the bank prohibited receiving such money in payment of notes deposited for collection, but told said Crupper in the presence of said Cogan, that plaintiff would receive said money, in payment of debts due the plaintiff by Mr. McVeigh; that said Lambert then delivered the notes given by Cogan to said Crupper, taking his receipt therefor signed by him as agent, a copy of which is inserted in'the bill of exceptions; that said Crupper collected said notes of Cogan in Virginia currency, and the plaintiff accepted the same of Crupper, and applied the amount, to-wit: $2,379, by direction of said Crupper, to the note sued on, bearing date the 17th day of June 1861; that the firm of C. A. Baldwin & Co., composed of C. A. Baldwin & W. E. McVeigh, drew a check in the city of Eichmond on the 29t,h day of January 1863, on the plaintiff in favor of Maria L. Baldwin, the wife of C. A. Baldwin, which said check is in the words and figures following to-wit:
January 29th, 1863.
Cashier Bank Old Dominion, pay to the order of Mrs. Maria L. Baldwin any money she may call for, *790 taking receipt for the same on the back of this cheek, . . & charge same to our account.
C. A. Baldwin & Co.
Endorsed—Received June 10th 1863 of the Bank of the Old Dominion, eighteen hundred and fourteen tee dollars on account of the within check.
Maria L. Baldwin;.
that said check was sent through the hostile lines, and Mrs. Baldwin handed it to Robert Crupper, who. presented it to W. H. Lambert, the cashier; that Mrs. Baldwin was requested to put her name on the check and did so, but whether before or after the receipt was written thereon did not satisfactorily appear; that said Lambert acting under the direction of Crupper, claiming to be the agent of Wm. 1ST. McVeigh, directed the balance due C. A. Baldwin & Co. from the-plaintiff, to wit: $1,814.95, to be applied to the credit of the note sued on, dated the 17th of May 1861; that said Crupper at' the time had in his possession the-bank book of C. A. Baldwin & Co. and the said check,, and that said Lambert thereupon made the entries in the bank book in the following words and figures, to wit: “’63, June 10. By check M. L. Baldwin, $1,814.95;” that the two notes dated 17th May and 17th June 1861 were discounted for the use and accommodation of Wm. ET. McVeigh by the plaintiff, and the proceeds thereof were received to his own use; that Mrs. Baldwin never received one cent on said check; that she did not in person direct Lambert to apply the balance due C. A. Baldwin & Co. to the payment of the note of J. H. McVeigh & Son endorsed by Wm. R. McVeigh; that upon her return to Richmond she stated that she did not know what was done with the money—she had put her name on the back *791 of the cheek, but had received no money; that said check was cancelled, and the check and bank book retui’ned to Robert Crupper; that Mrs. Baldwin wishlist in Alexandria stopped several months with Robert Crupper as his guest, who on her return to Richmond in July 1863, accompanied her to Annapolis; that the receipt on said check above the signature of Maria L. Baldwin, was made by, and is in the hand-writing of Wm. H. Lambert; that said Crupper also collected of E. E. Hough $200 rent due from him as tenant off Wm. H. McVeigh, and took also from said Hough a note for $300, which was after the close of the war, sent by James H. McVeigh to Wm. H. McVeigh; that Wm. H. McVeigh was the owner of a large real estate in the city of Alexandria which was confiscated during the war, and said Crupper was apprehensive that the balance due C. A. Baldwin & Co. and the Cogan notes might also be confiscated; that Wm. H. Lambert stated that Robert Crupper acted generally as the agent of Wm. H. McVeigh, and assigned, as the acts of agency within his knowledge, the action of Crupper with the plaintiff in the matter of the Cogan notes, the cheek of C. A. Baldwin & Co., the payment of the notes endorsed by Wm. H. McVeigh, the possession of Wm. H. McVeigh’s bank book, and his renting out one of his houses.
The defendants then proved that after the occupation of Alexandria in 1861 they left their homes in Alexandria as aforesaid, and that C. A. Baldwin & Co., whilst residing in Richmond, gave the check above described to Mrs. Baldwin, to be carried through the lines, or sent it to her through the hostile lines; that after the close of the war, Wm. H. McVeigh wrote to the officers of the Bank of the Old Dominion for his papers and books, which had been left at the bank *792 when he left his home in 1861. Some time in 1865 the papers, including the bank book and check, were forwarded to him in Richmond, but by whom it was not known or proved. There was also returned the receipt of George H. Smoot, president pro tem. of the bank, in the following words and figures, to wit: “Received, Alexandria, June 10th, 1863, of J. H. McVeigh & Son, per Maria L. Baldwin, $1,814.95, which sum is endorsed as a part payment of J. H. McVeigh & Son’s note for $2,500, dated May 17, 1861, and endorsed by Vm. bT. McVeigh, due August 15th-18tb, 1861, discounted and due to Bank of Old Dominion, and lying over under protest, as will appear per bank book. Geo.-H. Smoot, president pro tem.;” that on the 30th day of May 1864, James H. McVeigh & Son-paid to the branch bank of the Bank of the Old Dominion at Pearisburg the full amount of the notes sued upon in Confederate currency, which was received by said branch; that, at that date, the average value of one dollar in gold, compared with Confederate notes, was from eighteen to twenty-one; that the said C. A. Baldwin & Co., upon the receipt of the said papers and book from the Bank of the Old Dominion, on the 12th of February 1866, addressed a communication to the bank in the following words and figures, to wit:
Richmond, Va., Feb. 12, 1866.

Mr. Geo. H. Smooi, President Bank of the

Old Dominion, Alexandria, Va. :

Sir,—We hold statement of our account with Bank of the Old Dominion, showing a balance due to us of $1,815.05. Ho part of that fund has ever been drawn with our authority, and we hold the bank responsible for the same. The amount pretended to have been *793 paid on check, dated January 29th, 1868, to Mrs. Maria L. Baldwin, of $1,814.95, we repudiate as a fraudulent transaction.
Very resp’y, your ob’t serv’t,
C. A. Baldwin & Co.”
It was further proved that the plaintiff, in the fall of 1865, sent commissioners to take possession of the assets .of the branch bank at Pearisburg, which was done, and the plaintiff, on the 30th of June 1866, published a statement, of which a copy is inserted in the bill of exceptions. It was also proved that J. H. McVeigh & Son were within the Confederate lines during the war, and that C. A. Baldwin and Wm. N. McVeigh were at Biehmond during the war, doing business there, and have so continued until the present time (to wit: the time of the trial); that Crupper died in November 1865; that Wm. N. McVeigh was in Alexandria twice after the close of the war, and before the death of Crupper, and saw Crupper on both occasions; that Crupper was an honorable and high-minded gentleman; that the earliest disaffirmance of the agency of Crupper by Wm. N. McVeigh was the letter of C. A. Baldwin & Co. from Biehmond, of February 12th, 1866; that the notes of the 8th and 17th of June 1861 were renewals of notes given before the war.
And this being all the evidence, the plaintiff prayed for eleven instructions, of which the court gave the first, second, third, fourth, sixth, seventh and tenth, and refused the rest. The defendants then prayed for twelve instructions, of which the court gave the first, second, eighth, ninth, tenth and twelfth in the form in which they were asked, refused the fourth and fifth in the form in which they were asked, but gave them with •a modification, and refused the rest altogether. To *794 which several rulings of the court, in granting instructions prayed for by the plaintiff, refusing instructions. prayed for by the defendants, and giving with a modica^OÜ fourth and fifth prayed for by the defendants, the latter excepted,
The jury having returned a verdict in favor of the piaintiff, the defendants moved the court for a new tidal, because the verdict was contrary to law and'the evidence; but the court overruled said motion; to-which ruling of the court the defendants also excepted. And these two exceptions are embraced, and are all that are embraced in tbe defendants’ second bill of exceptions.
I will now proceed to consider the questions presented by this bill of exceptions in the order in which they arise, commencing with the first instruction asked for by the plaintiff, which was given.
The first instruction asked for by the plaintiff is in these words: “If the jury shall believe from the evidence that the notes sued on were duly protested, and due notice of the protest given to the endorser, they must find for the plaintiff, although they believe from the evidence, that the amount of said notes was paid by the defendants at the branch of the Bank of the-Old Dominion at Pearisburg in the month of May 1864, in depreciated Confederate currency, while the notes sued on were in the possession of the plaintiff, in the city of Alexandria.”
That the court below did not err in giving this instruction, is, I think, conclusively shown by the case of the Bank of the Old Dominion v. McVeigh, 20 Gratt., 457, which is, in all material respects, identical with this case, in regard to the question involved in this-instruction. The counsel for the defendants insists that there was error in granting so much of this in *795 struction as is embraced in these words: : “If the jury shall believe from the evidence that the notes sued on were duly protested, and due notice of protest given to the endorser, they must find for the plaintiff',” &c; and that whether “due notice of the . , . . protest was given to the endorser, was a question ot law or a mixed question of law and fact, and ought not to have been indiscriminately referred, as it was, to the jury. Certainly it was a mixed question of law and fact; and so was the whole question involved in the general issue joined on the plea of nil debet, which the jury were sworn to try. The object of that instruction was, not to refer to the jury the particular question of the sufficiency of the protest and notice, but to declare to them that, supposing such sufficiency to exist, they must find for the plaintiff, although they might believe from the evidence that the amount of said notes was paid by the defendants at the branch of the Bank of the Old Dominion, Pearisburg, in the month of May 1861, in depreciated Confederate currency, while the notes sued on were in possession of the plaintiff in the city of Alexandria. In other words, the object was to declare to the jury, that what was relied on by the defendants as payment of the notes, was in fact no payment at all. The question of the sufficiency of the protest and notice was referred to the jury by other instructions. The plaintiff asked for eleven, and the defendants for twelve instructions, which, or such of them as were given, seem to inform the jury upon all the questions of law arising in the case. I think there is no error in the plaintiff’s first instruction.
The second instruction asked for by the plaintiff is in these words: “If the jury shall believe from the evidence that the endorser ¥m. PT. McVeigh, after the making and endorsing of the said notes, left the *796 city of Alexandria, and was absent from said city at the time of the maturity of said notes; and that notice of demand and protest was left by the notary at residence of the said endorser, with a white servant of the endorser; such notice is sufficient in law, and the jury must find for the plaintiff'; provided they ajs0 at the time of said notice, the said McVeigh had a residence in the city of Alexandria.”
I think there is no error in this instruction. It merely declared to the jury this plain proposition: that if the endorser’s place of residence, both at the date and maturity of the notes, was in the city of Alexandria, and notice of the dishonor of the notes wras left by the notary at such place of residence; such notice is sufficient in law; although the endorser, ^fter the making and endorsing of the notes, left the said city, and was absent therefrom at the time of the maturity of the notes. That the word residence was used in two different senses in the same instruction, can make no difference. It is very plain in what sense it is used in each instance; and that it involved a question of law as‘well as of fact, is an objection that has already been sufficiently answered.
The plaintiff’s third instruction is in these words:
“If the jury shall believe from the evidence that after the making and endorsing of the notes sued on, the endorser Wm. bT. McVeigh, left the city of Alexandria, and was absent from said city at the time of the maturity of said notes, and the same were duly protested, and due notice of demand and protest left at the place •of business of said endorser, with a white person employed at such place, such notice was sufficient to bind the endorser, and the jury must find for the plaintiff; provided they also find that at the time of said notice, *797 the said McVeigh had a place of business in the city of Alexandria.”
I think there is no error in the instruction, for the same reasons which have' been assigned in answer to the objections made to the 1st and 2d instructions. It merely declares to the jury the same principle in regard to place of business, which the 2d instruction declares in regard to place of residence. A notice of dishonor is sufficiently served by being left, either at the place of residence, or the place of business of the person entitled to such notice. It is objected by the defendants’ counsel, that “there is not a particle of evidence disclosed in the record” to show who Ramsey was, to whom, at the Bank of the Old Dominion, the notice of protest directed to W. if. McVeigh was delivered; whether he was white or black, or what connection he had -with the bank or the said McVeigh, &c. I think it may be plainly inferred from the evidence that he was a white person, and an officer of the bank, a part of whose duty it was.to receive such notices.
The plaintiff’s 4th instruction was: “If the jury shall believe from the evidence, that any of the notes sued on were made by James H. McVeigh & Son for the accommodation of the said Vm. if. McVeigh, and that they were discounted for the use of W. if. McVeigh, and that he received the proceeds of the same; then no notice of demand and of protest of such notes was necessary to bind the said endorser, and the jury must find for the plaintiff as to such notes.”
In the cases supposed by the instruction, Wm. if. McVeigh was in fact the principal debtor, though in form a mere endorser; and it seems to be admitted by the counsel of the defendants (which is certainly true in fact), that in an action of indebitatus assumpsit, the said endorser might be made liable for the debt as a *798 principal debtor. But it seems to be supposed by the counsel, that in a special action of assumpsit, founded on the endorsement of the notes, there must be, not onty an averrnent, but also proof, of demand, dishonor, protest and due notice of the same to the endorser, to authorize a recovery against him. There can be no ¿Joubt but that if the action in such a case be specially upon the endorsement of the notes, the plaintiff might aver that the notes were made, endorsed and discounted solely for the accommodation of the endorser, and such an averment would be a sufficient excuse for not averring demand, dishonor, protest and notice as aforesaid. The only doubt, if there be one, in the case, is, whether it is necessary for the plaintiff, where he sues specially upon the endorsement of the notes, to set forth his matter of excuse specially in his declaration; or whether he may, in the common form, aver therein demand, dishonor and protest of the notes and due notice of the same to the endorser, and prove his matter of excuse on the trial, in support of his averment in the declaration. Would this apparent variance between the allegata and the probata be real and fatal? Certainly the objection is purely technical. Is it valid?
According to the English practice, as it seems to be now settled, if no notice has been given at any time, because the holder had an excuse for not giving it, the excuse ought to be set out on the record—4 Rob. Pr. 443. “If,” says Parke B., “it has been given, but at a time which would be too late in usual course, the matter of excuse might, probably, be used to show that it was, under the circumstances, in reasonable time; but if never given at all, the record must show a sufficient excuse.” Id; Carter v. Flower, 16 Mees. & Welsh. R. 743. The circumstances amounting to a dispensation *799 of notice must be pleaded as such. Allen v. Edmundson, 2 Welsb., Hurlst. & Gord. R. 719. Both of these cases are cited in 4. Rob. Pr. 443. On the other hand the American practice seems to be well settled otherwise. Id. 441-2, and the cases cited; 2 Smith’s Leading Oases, Wallace’s notes, p. 74. In Shirley v. Fellows, Wadsworth Co., 9 Porter R. 300, the analagous cases are examined, and it is decided that the declaration rhay be in the ordinary way, and proof of such facts as dispense with the necessity of notice will, in law, be proof of notice. See also Campbell v. Bates, 11 Conn.R. 487, 493; Patton v. McFarlane, 3 Penn. & Watts. R. 419; Spann v. Baltzell, 1 Florida R. 302, 326. Also Norton v. Lewis, 2 Conn. R. 478, and Windham Bank v. Norton, &c., 22 Id. 213; Redfield & Bigelow’s Lead. Ca. 417.
I prefer the American to the English practice; as our growing policy has been to discourage technical objections, which are apt to stand in the way of the justice of a case; aud there has yet been no decision of this court on the subject. I am therefore of opinion, that the court below did not err in giving the 4th instruction asked for by the plaintiff.
The 5th instruction asked for by him was refused.
His 6th is in these words: “If the jury shall believe from the evidence, that Robert Crupper was the agent of Wm. H. McVeigh, during the war, and authorized by him to act as his agent under appointment made while the said Crupper, plaintiff and McVeigh were on the same side of the belligerent lines, and as such agent demanded and received the Cogan notes from the bank; and that the said Crupper, as such agent, collected the amount of the said notes, and paid the amount collected on the note in suit upon which said credit appears endorsed; and that said note was one *800 that was made for the accommodation of said endorser an(^ the proceeds of which were received by him; such credit binds the said McVeigh, and the jury must find accordingly-”
I think there was a sufficient foundation for this instruction in the evidence, and if so there can be nova]j¿[ objection to it. I therefore think the court below did not err in giving it.
The 7th instruction asked for by the plaintiff is in these words: “If the jury shall believe from the evidence that Eobert Crupper was the agent of ¥m. if. McVeigh, under appointment made while the said Cupper, plaintiff and McVeigh were on the same side of the belligerent lines, and as such agent called on the officers of the Bank of the Old Dominion with the check of C. A. Baldwin & Co., written and signed by McVeigh as a member of said firm, and endorsed by Maria J. Baldwin in the form required by the terms of said check, and directed such officer to apply the same to the credit of the note sued on, upon which said credit is endorsed, and that said note is one made for the accommodation of the said Wm. H. McVeigh, and discounted for his use, then such credit is binding upon the said McVeigh, and the jury must find accordingly.”
The only objection taken to this instruction is, that it is “clearly in the teeth of Bilgerry v. Branch Sons, 19 Gratt. 393.” I do not think that it is. That ease might have applied if this suit had been brought upon the check. But this suit was brought upon the note to which the money on which the check was drawn was applied as a credit. By the agency of Crupper, and by the means- of the check, the balance standing on the books of the plaintiff, to the credit of .0. A. Baldwin & Co., was applied to the credit of a debt due *801 by Wm. H. McVeigh, one of the firm of C. A. Bald win & Co. and the draftsman of the check, to the plaintiff. I can see nothing in this transaction, which is contrary to the case of Bilgerry v. Branch. If the plaintiff has given to McVeigh a credit to which he is not entitled, the latter has no good cause to complain of it; and if by that means an improper appropriation has been made of the funds of C. A. Baldwin & Co. in the Bank of the Old Dominion, the latter would still remain liable to the former for those funds. I am therefore of opinion that there was no error in giving this instruction.
The 8th, 9th and 11th instructions asked for by the plaintiff' were refused. The 10th was given, and is in these words: “If the jury shall believe from the evidence that the said Wm. H. McVeigh and C. A. Baldwin & Co. were notified of the fact that Robert Crupper, as their agent, had made said transactions with the plaintiff, and did not, as soon as they received such notice, or in a reasonable time thereafter, disaffirm such agency, they are bound by the acts of said Crupper.”
This instruction is founded on the well-settled rule of law, that a principal who is informed of the acts of his agent, done under color of his authority, and does not in a reasonable time thereafter object to such acts as unauthorized by the terms of the agency, is presumed to acquiesce in and confirm the said acts. This rule of law is not denied; but it is insisted in behalf of the defendants that the evidence does not warrant its application to this case, and does not afford a sufficient foundation for the instruction. I am of a different opinion, and therefore think the court did not err in giving the instruction.
Having considered all the instructions asked for *802 the plaintiff and given by the court, I will now consider the instructions asked for by the defendants and refused by the court, or given with a modification.
The 1st and 2nd instructions asked for by the defendants were given. The 3rd was refused, and is in these words: “If the jury shall believe from the evidence aforesaid, that the only notice of the non-payment and dishonor of the notes sued on, given to Wm. H. McVeigh, was the notice contained in the notarial certificate of protest, the said notice was invalid and inoperative to bind said Wm. bT. McVeigh, and they must find for him.”
Supposing the residence and place of business of Wm. IST. McVeigh to have been in Alexandria at the times of 'the maturity of the notes, then certainly notice of dishonor could lawfully be served on him by being left either at his said residence or place of business, and the notarial certificates of protest show that such notice was so served on him according to the rules of the common law on this subject, or, as it is called, the law merchant. But the defendant’s counsel contended that the rules of the common law have been modified by the Code of 1860, ch. T67, § 1, (which is the same as the Code of 1873, ch. 163, § 1,) and which provides that “a notice,no particular mode of serving which is prescribed, may be served by delivering a copy thereof in writing to the party in person; or, if he be not found at his usual place of abode, by delivering such copy, and giving information of its purport to his wife, or any white person found there, who is a member of his family, and above the age of sixteen years; or, if neither he nor his wife, nor any such white person be found there, by leaving such copy posted at the front door of said place of abode.” By the Code of 1860, ch. 144, § 8, (which is the same as *803 the Code of 1873, ch. 141, § 8,) it is provided that the protest therein mentioned “ shall be prima fade evidence of what is stated therein, or at the foot or on the back thereof in relation to presentment, dishonor, and notice thereof.” In the petition for a writ of error in this case, the defendants by their counsel argued, that as “the certificates of protest” of the notes sued on in this case “ all show that the notices were left at the dwelling of the endorser in the hands of his white servant, without alleging that the servant was over the age of 16” years—“ a fact not to be presumed, but to be shown affirmatively”—the said certificates show upon their face that the law was not complied with, and that the notice required was not served in the mode prescribed by law; and therefore that the said endorser is not liable.
The counsel who argued this case in this court seemed not to rely on that ground, and, at all events, I think it very clear that the statute before referred to, in regard to the mode of serving notices, was not intended to embrace notices of dishonor of negotiable paper, which are still governed by the law merchant, as they were before the enactment of the said statute.
The defendant’s 3rd instruction seems to have been asked for solely with the view of declaring that the statute aforesaid applied to the case, and that, according to the statute, due notice of the dishonor of the notes had not been given to the endorsei', who is therefore not liable.
But one of the counsel who argued the case for the defendants in this court, while not seeming to rely on the said ground taken in the petition, insisted in his argument that the said 3rd instruction ought to have been given on another ground: that “it brought up directly for adjudication the question of the suffi *804 ciency of the formal notices of the demand and protest, left at the abandoned late residence of the endorwhen it was known by the holder that, in the sud-^en an<^ aw^u^ emergency of a great civil war, he had observed his allegiance to their common state, and tad joined his family within her bosom, and that communjcation of notice to him was both illegal and impossible;” “that such a futile formality was, under the anomalous and altogether extraordinary and exceptional circumstances, no notice at all; that notice for the time was impossible, without any misconduct on the part of the endorser; and that impossiblity of notice excused delay in giving it, but that the excuse of impossibility was only an excuse for delay until the impossibility was removed. And as the facts upon which the instruction was based were ascertained and undisputed, the question raised was a pure question of law, and should have been decided by the court upon those facts in favor of the defendants, and thus ended the case.”
I do not think that the facts upon which it is thus sought to raise that question, from the action of the court in refusing to give this instruction, were ascertained and undisputed; and the court might, therefore, on that ground, have properly refused to give the instruction. But as the question must be considered and decided, if not now at all events when we come to consider the action of the court in overruling the motion for a new trial, it may be as well to cousider it at once. I therefore proceed to do so.
The question then is, whether, admitting the facts to have been as supposed by the defendants’ counsel, this was a case in which notice of the dishonor of the notes, by the holder and the endorser, was duly given or wholly excused; or was a case in which it was im *805 possible to give such notice at the regular time, by reason of war, and the giving of it at that time was therefore excused; but the excuse was not and was only for a delay until the impossibility was removed. See 1 Parsons on Notes and Bills 522, 581-2, cited by the counsel for the defendants.
Where the holder and endorser of a negotiable note reside in the same city at the time of the dishonor of the note, notice of such dishonor may be given by being left at the residence or place of business of the endorser; as was done in this case. Where they reside in different cities, or at different places, between which there is a regular mail communication, such notice may be sent by post; and that is the best mode of giving it. Where they reside in different states or countries when the contract of endorsement is entered into, such notice must still be given, or due diligence must be used by the holder to give it. Where the endorser changes his residence from one place to another in the same state, after endorsing the note and before its maturity, he is still entitled to notice of its dishonor, if his new place of residence is known to the. holder, or can be ascertained by him by using due diligence; but where such change of residence is from one state to another state or country, the holder is not bound to give such notice, and the liability of the endorser becomes absolute and unconditional without it. Where the holder and endorser reside in different states or countries at the time of the endorsement and maturity of the note, and war arises between such states or countries between those periods, and continues to exist at the time of such maturity, the impossibility which thus arises of then giving such notice is a legal excuse for not doing so. The excuse, however, is not permanent, but is only for a delay until the impossi *806 bility ceases, when due notice must be given. Where the holder and endorser resided in Virginia at the time of the endorsement of the note, but before its maturity the late civil war broke out and a military line was drawn between the places of residence of the two,. which rendered it impossible to give notice of the disponor 0f tpe nofe at the regular time, it was necessary to give it in due time after the impossibility was removed. Where the holder uses due diligence to ascertain the place of residence of the endorser at the time of the maturity of the note without being able to do-so, he is altogether excused from giving such notice, and the liability of the endorser then becomes fixed and absolute, and the holder is under no obligation to give such notice, even though he may afterwards discover the placemf residence of the endorser. So also, where the holder, using such due diligence, is wrongly informed as to the place of residence of the endorser, and transmits notice by post according to such information, the liability of the endorser becomes thereby fixed and absolute, and the holder is not bound to give jany other notice, even though he be afterwards correctly informed as to the residence of the endorser. The foregoing seem to be well settled principles of law, as the following authorities will show: 2 Rob. Pr. new ed., pp. 176, 177, 191, 192, 193, 194 and 195 and the cases cited; 1 Parsons on Notes and Bills, pp. 477, 487-490, 522, 527, 528, 531, 532, 448-463; Leading cases upon Bills of Exchange and Promissory Notes by Redfield & Bigelow, pp. 404, 410, 447, 450, 452; McGruder v. The Bank of Washington, 9 Wheat. R. 598; Bank of Columbia v. Lawrence, 1 Peters R. 578; Williams v. Bank of the U. S., 2 Peters R. 96; Bank of Utica v. Bender, 21 Wend. R. 643; Hopkirk v. Page, 2 Brock. R. 20; House v. Adams & Co., 48 Penn. State *807 R. 261; Taylor v. Snyder, 8 Denio R. 146; Foster v. Julien, 24 New York 28; Adams v. Leland, 30 Id. 309; Lambert & al. v. Ghiselin, 9 How. U. S. R. 552; Farmers Bank of Va. v. Gunnell’s adm’x, supra, 131.
The case under consideration is peculiar in some of its circumstances; and the question arises, what principles apply to it, and whether, according to those principles, the endorser is liable?
At the date and discount of all the notes, except two of them which will be hereafter noticed, all the parties thereto, the makers, endorser and holder, resided, and had places of business, in the city of Alexandria, and the holder, the Bank of the Old Dominion, continued to reside, and have its place of business there, until and after-the maturity of the notes. But before the maturity of the notes the late civil war broke out, and the forces of the United States invaded and took possession of the city of Alexandria, and continued to hold such possession until the end of active hostilities, in April 1865. A few days after such invasion, the makers and endorser of the notes left the city of Alexandria, crossed the military lines into that part of the state of Virginia which was under Confederate authority, and remained there during the war, engaged in business most or nearly all of the time. "When Wm. U. McVeigh left Alexandria, he had been preceded by his family, who were then in the neighboring county of Fauquier, on a visit, where they were rejoined by him. It does not appear that he left with any intention to change his residence; at least unless he should be compelled to do so, by the continuance and effects of the war; but, on the contrary, no doubt he expected the war to terminate much sooner than it did, and intended to return' and continue to reside, and transact business in, Alexandria. *808 He was president of the Bank of the Old Dominion, • and his place of business was the said Bank, when he left in May 1861;. and at the expiration of his term of office he was re-elected president in 1862. He left a white person in care of his mansion house, and an agent, Robert Crupper, at least to watch over and preserve his real estate, of which he bad a great deal in the city. Under all these circumstances, no doubt both the Bank of the Old Dominion and Vm. H. McVeigh considered, that the latter continued to have his place of residence and of business in the city of Alexandria at the time of the maturity of the said notes; that he had left there cum animo revertendi; and that he would soon be able to return, and would return, to the said city. The first battle of Manassas was fought in July 1861, and won by the Confederates; and about the same time but shortly thereafter all these notes were protested for non-payment. After that victory was won, no forward movement was made by the enemy for a long time, and the highest hopes were indulged by us that the war would soon be ended in our favor. Accordingly notice of the dishonor of the notes was left at the said residence or place of business of the said endorser McVeigh in Alexandria; the notice in the former case being left in the hands of his white servant at his said residence, and in the latter being delivered to G. W. D. Ramsay at the said bank; the said servant and said Ramsay being respectively informed at the time, that said endorser was held liable for the payment of said notes respectively. In all of the cases except one the notice was left at his said residence, or “dwelling” as it is called in the certificates of protest, “in the hands of his white servant.” If due notice was given, or due diligence used to give it, according to the circumstances existing at *809 the time of the dishonor, the rights of the parties then become fixed, and are not changed by a change of circumstances afterwards.
How the question is, did the holder, the Bank of the Old Dominion, do all that was necessai'y to be done to fix the liability of the endorser McVeigh and make it absolute? Certainly that was the case if it can be considered that at the time of the maturity of the notes McVeigh’s place of residence and of business continued, in contemplation of law, to be in Alexandria; at least for the purpose of giving notice of dishonor?
How far then, if at all, is the case altered by the facts aforesaid, in regard to the removal of McVeigh from Alexandria, and his crossing the military lines into that part of the state which was under Confederate authority, and remaining there until after the war? Did those facts render it necessary that notice of the dishonor of the said notes should be given to him after the end of the war, to make him liable as endorser?
Certainly I do not doubt his perfect right, if it was not his duty, to leave Alexandria, cross the military lines, and remain on the Confederate side during the war, as he did. And certainly I do not think that he ought to be punished for having done so.
But the question is, who ought to bear the loss of these dishonored notes, the holder or the endorser; and that question must depend upon the settled rules of law. Each of these parties has his rights, which must be accorded to him. The holder advanced the ■amount of the notes on the faith of the liability of the endorser; which liability, it is time, was merely conditional. But has not the holder performed the condition? Did he not give due notice of the dis *810 honor? And has he not done everything that due-diligence required of him? If the endorser did not actually know that the notes were not paid at maturity, and that he was held liable for their payment, (the makers of the notes, his brother and nephew, I believe,, having left Alexandria at the same time and for the-same cause with himself, and having remained on the-same side of the military lines with him,) he could easily have ascertained that fact by enquiry, at least after the war was over. And under the circumstances, was it not incumbent on him to make such enquiry if' he was interested in knowing the fact, and did not already know it, as he no doubt did? The holder, the Bank of the Old Dominion, was certainly not in fault-in bringing on the war and producing the cause which induced the endorser to leave Alexandria and cross the military.lines. And when the notes were dishonored, the holder gave all the notice of such dishonor-which could then possibly be given. How then can it be said that the holder was in default? The endorser had, undoubtedly, a right of election to remain in Alexandria or to cross the lines. Had he remained in Alexandria, the notice of dishonor which was given by the holder would certainly have been sufficient.. He chose to cross the lines, and in doing so, no doubt acted patriotically. But he thereby took upon himself the burden of enquiring into the fact of the payment or non-payment of the notes at maturity, and did not throw upon the holder the burden, of not only giving such notice as they could and did when the notes were dishonored, but also a new notice to the endorser after-the war was over. If he did not actually appoint an agent to receive such notices during his absence, he-might and ought to have done so.
I have seen no case, and we have been referred ta *811 none, precisely in point with this, and those which seem to bear the closest analogy to it, are McGruder v. The Bank of Washington, 9 Wheat. R. 598; Redfield & Bigelow’s Leading Cases 447, S. C.; and the cases which have followed it, referred to in the note to that case in the Leading Cases p. 449; and the cases referred to in 2 Rob. Pr. (new) p. 176. In that case it was held by the Supreme Court of the United States, that the removal of the maker of a note after its date and before its maturity, into another jurisdiction from that in which the note was executed, will excuse the holder from making a personal presentation and demand. For the same reason, a like removal of an endorser will excuse the holders from giving notice of dishonor. In the note, Id., it is said that “the doctrine of the above case is well settled. See Taylor v. Snyder, ante p. 145, and note; Adams v. Leland, 30 New York R. 309; Foster v. Julien, 24 New York R. 28. But the question, whether, in case of removal into another jurisdiction, presentment should be made at the payer’s last abode, has given rise to some conflict and cases on each side of the question are referred to in the note. But as the notices in this case were left at the endorser’s last place of abode, except one of them which was left at his last place of business in Alexandria, it is unnecessary to examine those cases. In the case of McGruder v. The Bank of Washington, supra, presentment was made at the maker’s last place of abode, which was of course held sufficient; hut it was not decided in that case, because the question did not arise, that such presentment was necessary. That it was sufficient, however, is enough for the purposes of this case.
I have not relied upon the case of Ludlow v. Ramsey, 11 Wall. U. S. R. 581, although it seems to show *812 that if this case were before the Supreme Court of the United States, the judgment would be affirmed on the grounds on which that case was decided. But I am uuwiHing to place the decision of this case upon those grounds, the correctness of which I do not admit; and I think the grounds on which I have relied, and about correctness of which I have no doubt, are amply sufficient to sustain the view I take of the case.
I am therefore of opinion that sufficient notice of the dishonor of the notes was given by the holder to the endorser in this case, and the former was under no obligation to give any other, to fix and make absolute the liability of the latter.
As the subject I have just been considering is, by far, the most important branch of the case, I will, at the risk of some repetition, present the following additional views thereon, which have been suggested to my mind since I wrote the foregoing, and which seem to me to be not only appropriate but conclusive.
There can be no commercial intercourse between persons on different sides of a belligerent line, during the war; and a civil war, such as our late war, stands in this respect, on the same footing with a war inter gentes. These are well settled propositions, and are affirmed by the late decisions of this court in Billgerry v. Branch & Sons, 19 Gratt. 393; and Taylor v. Hutchinson, 25 Id. 536. I was one of the court when each of these decisions was made, and concurred in each; and I do not now, at all, doubt their correctness.
But this case involves a very different question from the one involved in those two cases. Here, there was no commercial or other intercourse between persons on different sides of a belligerent line. Here, the question is: Was the notice of dishonor sufficiently •served by being left at the residence or place of busi *813 ness of the endorser? Or, if not, was the giving of such notice excused, under the circumstances of the case ? '
1st. Was the notice sufficiently served as aforesaid? Such a notice is always sufficiently served by being left, in due time, at the place of residence, or place of business of the endorser, whether it be ever actually received by him or not. If the endorser in this case had personally remained in Alexandria until after the dishonor of the notes, certainly such service of the notice would have been sufficient, notwithstanding he was attached to the Confederate cause. Suppose that on leaving Alexandria in May 1861, after the Federal forces had entered that city, he had informed the directors of the bank (he being then the president thereof,) that he expected and intended in a short time to return; and had requested, that if any notes endorsed by him and discounted at the bank, should be protested during his absence, notices of such protest should be left at his dwelling in said city, with a white servant he would leave there; would not notices left accordingly, have been sufficiently served ? There cannot I presume, be a doubt that they would. Was not that precisely the effect of what actually occurred? He left Alexandria with a manifest expectation and intention to return as soon as the cause which induced his departure ceased to exist. He did not resign his office of president of the bank. He knew he was the endorser of several notes which had been discounted at the bank, and which would soon become due there, and no doubt would be protested, and that he would be looked to for payment. He gave no express instruction as to the manner in which he should be served with notice of protest in such cases. Why did he not do so? Plainly because he knew, or had the *814 best reason to believe, that such notice would be left with his white servant at his dwelling house, as the best possible mode of giving such notice to him. That mo^e was precisely the one which he desired to be pursued. If he did not so desire, was it not his duty as president of the bank, its chief officer, to leave such instructions on the subject as were proper with the officers of the bank who were to remain at their posts? Was it not necessary for him to do so, in order to conserve and to guard those interests which had been intrusted to his care? The interests of widows and orphans and others who owned the stock of the bank? Was not his counsel peculiarly called for in this trying exigency? If he considered it to be his duty as a patriot to leave Alexandria at that time and cross the belligerent line, was it not equally his duty, as an honest man and faithful officer, to advise his board of directors what to do in regard to the notes due to the bank on which he was an endorser, in order to ensure his liability for them? Was there any conflict in this case between patriotism on the one hand, and honesty and fidelity on the other? Could he not be patriotic, and at the same time honest and faithful? I think he could; and I think he intended to be so. I think he intended and expected the bank to do what it did do, in regard to these notes; and that the notice of dishonor/ was sufficiently served. But whether he so intended and expected or not, I think the notice was sufficiently served. He manifestly left Alexandria intending to return to the city as soon as the Federal forces left it; which he and everybody else interested in the subject, expected soon would be the case. Alexandria continued to be his place of residence when the notices of dishonor were left with a white servant in his dwelling house there. And therefore they were *815 sufficiently served. But if not, I proceed to consider,
2dly, Was the giving of such notices excused, under the circumstances of the case ?
When the federal forces entered and took possession of Alexandria, it did not thenceforward cease to be a part of Virginia, though the control of the state authorities over it was temporarily suspended during such hostile occupation, the prospective duration of which was wholly uncertain. It might terminate at any time. The citizens of Alexandria at the time of such occupation, or most of them, were attached to the Confederate cause. Many of them crossed over the belligerent line to the Confederate side, especially of those who were of suitable age to render military service. But many, and probably most of them, especially of those who, from their age or otherwise, were non-combatant, remained at their homes; and remained with perfect safety, notwithstanding their natui’al and known predilections in favor of the Confederate cause. It does not appear from the record whether the plaintiff in error was of suitable age to render military service.
The presumption is he was not, as it does not appear that he actually did engage in such service after he crossed the line. Had he so engaged, he would doubtless have brought the fact into the record. But I consider the fact as wholly immaterial. Whatever may be said, in a patriotic point of view, in regard to the propriety of a removal from Alexandria at that time to the Confederate side of the belligerent line, of those who were friendly to the Confederate cause, it cannot be said that there was any necessity for such a removal. It was purely a matter of voluntary election, however strong the patriotic motive may have been to make such removal, especially with those who could render military service. In a commercial sense, and accord *816 ing to the lex mercatoria in regard to dealings with negotiable paper, the removal was voluntary. The Bank, the holder of the negotiable notes in this case, could n0^ expected to know what motives induced the endorser to cross the belligerent line, or what he ~ ^ . intended to do alter crossing it, or how long he m-tended or expected to remain there, and when he intended or expected to return to his home and place of business in Alexandria. And the necessity of giving notice of dishonor, and the manner of giving it, cannot depend upon considerations of that kind. The law merchant is a certain law, and its rules, especially in regard to negotiable paper, are fixed and definite. Here then the endorser, after endorsing these notes and before' their maturity, voluntarily left his home and his place of business and crossed the belligerent line, whereby he interposed an insuperable barrier between himself and the bank, and made it impossible for the bank, at the time of the dishonor of the notes, to give him notice thereof, either personally or by communication through the mail. Was not the duty of giving such notice thereby excused ? What did he lose by not receiving such notice? It would have been notice only of a fact which he well knew without such notice. And if he wished to know it better, if possible, or to be otherwise informed of it, he could easily have informed himself, at least after the war ánd as soon as notice could then have been given to him. It is true that it is immaterial under the law merchant, whether he was actually damaged or not by the failure to give notice, and he is entitled to his discharge irrespectively of that question, if, according to the certain and definite rules of that law his liability is not fixed. Still the question is a material element in determining whether, according to those rules, the *817 duty of giving such notice is excused under the circumstances. If he desired to cross the line and remain on the Confederate side during the war, it was a small price to pay for the gratification of such desire, that the holder’s duty of giving him notice of a fact which he already knew, should he dispensed with, and that he should be subjected to the little trouble of informing himself after the war was over, in regard to the dishonor of the notes, if he desired to be further informed on the subject; rather than the bank should be subjected to that trouble which it had no agency in causing. I am therefore of opinion that the duty of giving such notice was excused. But if it was not I am of opinion, and I think I have already demonstrated, that sufficient notice was actually given.
There could have been no difficulty in regard to demand of payment of the notes at the Bank of the Old Dominion, arising from the fact, that at the time of the maturity of the notes the makers and endorsers were on the Confederate side of the belligerent line. They could not, of course, cross the line to make such payment, nor send the money across for that purpose. But they could either have remained until after the maturity of the notes where they were when the notes were executed; or if they preferred it, as ¿they did, they could have crossed over the line, taking care in the latter case to provide for the payment of the notes at maturity by the appointment of an agent for that purpose before they left Alexandria. Certainly it was the right and duty of the bank to receive payment of the notes at maturity from any person who might make such payment, provided there was nothing unlawful in the act of payment, as there certainly would not be in either of the two alternatives above stated. There is no necessity for any actual demand of pay *818 ment of the notes in such cases by the holder of the maker, nor is any such demand ever made. It is only necessarythat the notes should be at the bank at the time therein named for payment, ready to be delivered to the payer upon such payment. If payment be not made the notes are dishonored, and may forthwith be panc];eci to a notary for protest, and notice to the endorsers. Thus there is, in all this operation, no need for any communication between persons on different sides of a belligerent line, and no necessity for any violation of international or other law. But whatever difficulty the war may have interposed in the way of payment of these notes at the times of their maturity, and even though it may have been impossible in consequence of the war to make such payment, the makers were not thereby legally discharged from their obligation to pay them according to the terms of their contract; but both they and the endorsers were liable Ibr all the consequences of non-payment, just as if there had been no war. Neither the act of God, nor •of the public enemy, was sufficient to discharge or excuse them from the obligation to perform their contract. Such has been the settled law of the land ever since the leading case of Paradine v. Jane was decided by Chief Justice Rolle.
In every view of this question, therefore,I think the endorser is liable.
The 4th instruction asked for by the defendants was in these words: “If the jury shall believe from the evidence, that on and after the 7th day of June 1861 the said James H. McVeigh and Wm. N. McVeigh were residing within territory held in the firm •occupation of the forces of the Confederate States, and ¡so continued to reside until the close of the war; and •that the- said plaintiff had its domicil from said date, *819 and ever since in the city of Alexandria, held in the firm occupation of the forces of the United States during the war; then that the two notes sued on, one hearing date the 8th of June 1861, and the other June the 17th, 1861, are illegal and void, and they must on these notes find for the defendants.” The court refused to give the instruction in this form, but gave it with the addition of these words: “Unless they also find that said notes were given in renewal of notes made before the war, and by an agent acting under authority conferred before the war.”
The evidence tended to prove the facts stated in the addition made by the court to the instruction, and such being the facts, the court would have erred in giving the instruction as asked for, but did not err in modifying it and giving it in its modified form as aforesaid. An accommodation note given to be discounted at bank is generally given for a certain number of days, say 60 or 90, with the understanding that the accommodation is to be continued for a much longer, time by a renewal of the note from time to time until the end of the period of the accommodation. In such case the successive renewals are not considered as new debts or contracts, but merely continuations of the original one; and though the original debt could not have been created between belligerents, yet if the original debt had been created between them when they were at peace with each other, •and before they became belligerents, with an understanding and agreement between them that the accommodation should be continued beyond the time named in the note, by a renewal of it from time to time, then -a note given for such renewal by an agent acting under authority conferred before the war, such agent .and the holder being at the time of such renewal on *820 the same side of the military lines, would be legal and ,. j Valid.
The 5th instruction asked for by the defendants is jn these words: “If the jury shall believe from the evidence aforesaid, that the said notes bearing date respectively the 8th and 17th days of June 1861 were ma(je by the defendants whilst residing within the lines occupied and firmly held by the forces of the Confederate States, and that said notes were discounted by the plaintiff whilst the said defendants were within the Confederate lines as aforesaid, and that the plaintiff was at the time of the making and discounting of the said notes located and doing business within the lines firmly held and occupied by the forces of the United States, then that said making and discounting were illegal and void, and not binding on the defendants.” The court refused to give the instruction in this form, but gave it with the addition of these words:. “Unless said notes were given in renewal of notes made and delivered before the war, by an agent residing within the lines of the same belligerent with the plaintiff, and acting under an authority conferred before the war.”
For the same reasons assigned in regard to the 4th instruction and modification thereof as aforesaid, I am of opinion that the court did not err in refusing to give the 5th instruction as asked for by the defendants, nor in giving it with the modification thereof as aforesaid.
The 6th and 7th instructions asked for by the defendants are in these words:
“6. If the jury shall believe from the evidence aforesaid, that the defendant, James H. MeYeigh, in the year 1864 paid the notes sued on to the branch bank of the Bank of the Old Dominion at Pearisburg *821 in Giles county, Virginia, and that said payment was accepted by said branch hank, then that said payment is a discharge of the said notes, although the same was made in Confederate money.”
“7. But if said branch bank at Pearisburg had no lawful right to accept said payment in discharge of the notes sued on, yet if the jury shall believe from the evidence aforesaid, that after the close of the late civil war the plaintiff took possession of all the assets of the branch bank at Pearisburg, amongst which were means and assets acquired during the war by dealing in Confederate currency, and in which were embraced the payments made by James H. McVeigh & Son, and appropriated said assets to their own use, then such appropriation is an adoption and ratification of the act of,the said branch at Pearisburg, and they must find for the defendants.”
That the court did not err in refusing to give the said 6th instruction, is, I think, fully shown by the case of the Bank of the Old Dominion against Mc Veigh, 20 Gratt. 467, and by what has been already said in regard to the 1st instruction asked for by the plaintiff. Hor did the court err in refusing to give the said 7th instruction. If the defendants can have any claim against the plaintiff, arising from the latter’s taking possession of the assets of the branch bank at Pearisburg, as stated in the said instruction (which is not admitted), their remedy for its recovery is not by way of defence to this suit, in which no such claim has, if it could have, been put in issue.
The 8th, 9th, 10th and 12th instructions asked for by the defendants were given by the court. The 11th was refused, and is in these words: “ If the jury shall believe from the evidence aforesaid, that the check of C. A. Baldwin & Co. on the plaintiff, dated the 29th *822 day of January 1868, was drawn by tbe firm of C. A„ Baldwin & Co. at that time in the city of Richmond, with a view of being sent through the hostile lines, an(j was go sent, received and acted on by the plaintiff,, then such appropriation of the proceeds of a balance due C. A. Baldwin & Co. by the plaintiff, to the note 0f jameg p£. McVeigh & Son, was illegal and void.”
This is not an action brought upon the check, in which the legality of the check would be a material question. If, as the evidence tends to prove, Crupper, as agent of the parties concerned, with authority, conferred before the war, applied the balance in the Bank of the Old Dominion standing to the credit of C. A. Baldwin & Co., to the payment of the note of James H. McVeigh & Son, as mentioned in the instruction; such appropriation of the said balance was not illegal and void, even though such check may have been used in making it. But a sufficient reason for refusing this instruction is, that the defendants, instead of being prejudiced, are benefitted, by the appropriation aforesaid ; and if C. A. Baldwin & Co., who are not parties to this action, are injured by said appropriation, they have their remedy against the Bank of the Old Dominion, which, in that view, would still owe the said balance to them.
Having noticed all the instructions on both sides which are subjects of exception on the side of the defendants, I will now notice their exception to the ruling of the court refusing to grant a new trial because the verdict was contrary to law and the evidence. The main, if not the only, question relied on in support of the motion for a new trial seems to be, as to the want or insufficiency of notice to the endorsers of the notes. This question-has already been fully considered by me in disposing of the subject of the in *823 structions, and especially the 3d instruction asked for by the defendants. I will not therefore repeat here what I have already said in this opinion, in regard to this question. One of the counsel of the defendants contends that the verdict of the jury should have been in their favor, in conformity with the first and second instructions asked for by them and given by the coui’t. I think both of these instructions ought to have been refused by the court; the first being in conflict with the case of McGruder v. The Bank of Washington, 9 Wheat. R. 598, and other cases of that class before cited; and the second being also in conflict with those cases, or else being a mere abstraction, and if given at all, ought at all events to have been so modified as to make it applicable to the evidence in the case. The jury no doubt considered from the evidence, that at the maturity of the notes, the endorser had not abandoned his residence in the city of Alexandria and acquired a residence within the lines of the forces of the Confederate States, but was only temporarily absent with the intention and expectation of soon returning to his home and place of business in Alexandria. According to that view of the facts, which was no doubt the view of the jury, they properly found a verdict for the plaintiff, even considering the law to have been correctly expounded in the first and second instructions asded for by the defendants. In any view of the law, however, I am of opinion that the court did not err in refusing to grant a new trial.
In regard to the defendants’ first bill of exceptions, it presents a question which seems to have been abandoned by them, as they have taken no notice of it in this court. I will therefore only say that I think it is not well founded.
Another objection taken by the defendants, for the *824 first time in this court is, that the action having been discontinued against Edgar McVeigh by order of the plaintiff; one of the principal debtors was thus released ^ creditor, which operated, necessarily, a release of the endorser, Wm. McVeigh, who was a mere surety. Certainly a voluntary release of a principal debtor by a creditor, without the consent of the surety, operates a release of the surety. But has there been any such release of a principal debtor in this case ? I think not. At common law, in a joint action against several defendants, ex contractu, it was a general rule that the judgment must be against all or none. There were exceptions to the rule; as in, the case of the infancy, or bankruptcy, of one or more of the defendants; in which case they were entitled to be discharged on personal grounds, while the other defendants remained liable to judgment. So also, where one or more of the defendants died pending the action, it abated, as to them, and judgment was rendered against the survivors. Formerly, the joint debtors who died pending the action leaving others surviving them, were forever discharged from liability, at least at law;. and the action could not be revived, nor a new action be brought against their representatives. Afterwards the law was changed in this respect by statute, and the representatives of one of several joint debtors or partners who died in the lifetime of another or others were declared to be liable for the debt. Code, ch. 141, sec, 13, page 988. So also, formerly, in a joint action ex contractu against several defendants, as it was generally necessary to obtain judgment against all or none, the plaintiff had to mature his action for judgment against all the defendants;; and if some of them could not be found, they were proceeded against to outlawry, and. the action was thus matured against them. This proceed *825 ing by outlawry being found inconvenient, a substitute for it, by proclamation and publication, was adopted by statute. 1 Rob. old Pr. p. 175.
Formerly, it was provided by statute that where the sheriff or other proper officer, returning the truth of the . . , . , . ,. case upon any original or mesne process to him directed, shall make return that any defendant is not an inhabitant of his county or corporation, the suit shall abate and be dismissed as to such defendant, if the court from which such process issued have jurisdiction over such county or corporation only. Id. 174. In a case which arose under this statute, McCall v. Turner, 1 Call 138, the writ issued against three defendants, but was executed on one only; the other two being returned, “no inhabitant.” As to those two the suit abated, and there was a plea by the other and a verdict and judgment against him. It was objected, that the action was on a joint bond, and that the plaintiff ought to have pursued all the obligors, and not entered an abatement as to those who were non-residents. But this court decided that the abatement was a regular and proper proceeding, and affirmed the judgment of the court below. So also, in Brown v. Belches, 1 Wash. 9, the writ was against two partners, but an abatement was entered as to one upon a return of “ no inhabitant,” and verdict and judgment were rendered against the other. The abatement which had been entered as to one was held to be regular, and the judgment against the other was affirmed. 1 Rob. old Pr. 174. Afterwards, by an act passed April 2,1839, entitled, “An act regulating the proceedings against joint defendants,” it was enacted, “that whenever an action shall hereafter be commenced against several defendants who may be bound jointly, or jointly and severally, and the process shall have been executed on one *826 or more of them, and not executed as to the others,. the plaintiff or plaintiffs may proceed with his or their cause againstthose defendants who have been arrested, arL<^ discontinue the same as to the others, or proceed against them separately, as they Bhall from time to-time be arrested, until judgment be obtained against an(j executions may issue upon such judgments respectively, when obtained, as in other cases.” This, act was afterwards embodied in the Code of 1849, and continued in the Codes of 1860 and 1873; in the last of which, it may be found in ch. 167, sec. 50, p. 1096, in these words: “ Where, in an action against two or more defendants, the process is served on part of them, the plaintiff may proceed to judgment as to any so served; and either discontinue it as to the others, or, from time to time, as the process is served as to such others, proceed to judgment as to them, until judgment be obtained against all.” The same language is used in each of the Codes, and though it somewhat differs from the language of the act of 1839, the substance is the same.,
In this case, after process had been served on all the defendants except Edgar McVeigh, and several times returned, “not found,” or “no inhabitant,” as to him; the plaintiff, in pursuance of the-said provision of the Code, discontinued the action as to the said defendant McVeigh, and proceeded to judgment as to the other defendants. Certainly, it was never intended by the legislature that a defendant as to whom an action might be thus discontinued, should be thereby discharged from liability for-the debt. The object of the law was to enable a plaintiff to obtain judgment against the defendants in a joint action as he might be able to mature his action, against them; without being compelled, as formerly,„ *827 to wait until he could mature the case for judgment against all at the same time. And it gives him the right, after taking judgment against such of the de fendants as may have been served with process, to proceed in the same action to have it matured against the rest, and as matured to take judgments against them; or, at his election, to discontinue the action against the rest. In which latter case, the plaintiff may bring a new action against the defendants as to whom the original action may have been discontinued; who may, in such new action, make the same defence they might have made in the original action, whether served with process originally or afterwards. They would have the same advantage in making their defence in a new action, as they would have in the original one; and there is as much reason why the plaintiff should have a right to bring a new action against a defendant as to whom the original action may have been discontinued, as to proceed to have the original action matured and tried against the same defendants.
To be sure the act • does not expressly reserve to the plaintiff the right to bring such new action. But the legislature could not have intended, if even it had the power, to discharge the defendant as to whom the action is discontinued, from liability. And it is more reasonable to infer an intention to reserve such right than an intention to give such discharge. Formerly, as we have seen, the law directed, an action to be abated as to a defendant against whom the process was returned, “ no inhabitant,” and authorized the plaintiff to proceed to trial and judgment against the defendants who may have been served with process. Suppose the action was for a joint debt; could the law have intended that the defendant as to-whom the action was thus abated, should he dis *828 charged from the debt? The abatement, in that case certainly, was involuntary on the part of the plaintiff, and was a legal necessity. It occurred very frequently, and whenever joint debtors resided in different counties and were sued in one of them. Could the legislature have intended, in every such case, to deprive creditor of a part of the security for the payment of the debt due to him by his joint debtors? I think not. It may be said that the discontinuance is voluntary on the part of the plaintiff. But it stands in the place of an abatement on a return of “no inhabitant” under the former law. Each was intended for the benefit of the plaintiff, and to facilitate his remedy, though neither was intended to do any harm to the defendant as to whom the action is abated or discontinued; and certainly none could be done to him by leaving his liability for the plaintiff’s claim just where it was before such abatement or discontinuance, and fully reserving to him all his rights of defence. This is not like the case .in which a creditor voluntarily takes a bond of one of several joint debtors by simple contract; 5 Rob. Pr. p. 808; or brings an action and obtains a judgment against one of several joint debtors; Id. 622; in which cases, according to the common law rule, the debt would be merged in the bond or the judgment. But it is a case in which the common law rule is modified under the operation of a statute, and the doctrine of merger does not apply. Id. 823; Mason v. Eldred &c., 6 Wall. U. S. R. 231.
I am therefore of opinion that the discontinuance ■of the action against Edgar McYeigh does not affect the validity of the judgment against the other defendants.
Only one question more remains to be disposed of, •and that question was argued with great ingenuity by *829 the learned counsel for the defendants. It is, whether the notes come within the meaning of section 7, of chapter 144 of the Code of 1860; for, if they do not it is argued that they do not come within the meaning of section eight of the same chapter, and the protest is not therefore legal evidence; and that being the only evidence introduced by the plaintiff to prove presentment, dishonor and notice thereof, there was no evidence before the jury of these indispensable facts to sustain their verdict; which ought, therefore, to have been set aside.
The Code of 1860, ch. 144, § 7 (which corresponds with the Code of 1873, ch. 141, § 7), is in these words:
“Every promissory note, or check for money payable in this state at a particular bank, or at a particular office thereof for discount and deposit, or at the place of business of a savings institution or savings bank, and every inland bill of exchange payable in this state shall be deemed negotiable, and may upon being dishonored for non-acceptance or non-payment be protested, and the protest be in such case evidence of dishonor, in like manner as in the case of a foreign bill of exchange.”
Section 8 (which is like the corresponding section of the Code of 1873) is in these words : “ The protest, both in the ease of a foreign bill, and in the other cases mentioned in the preceding section, shall be prima facie evidence of what is stated therein, or at the foot, or on the back thereof, in relation to presentment, dishonor and notice thereof.”
It is argued that a promissory note or other instrument, to come within the meaning of § 7 aforesaid, must on its face be expressly payable in this state.
How it is certainly true that such note, &c., must on its face be payable in this state, because the section so *830 requires. But it does not require that the state shall be expressly named in the note, &c. It is sufficient if the note, &c., on its face be “ payable in this state,” accor(bng to the legal rules for the construction of written instruments. The same rules which apply to the construction of wills, deeds and contracts, apply to construction of promissory notes, &c. In all such cases the court of construction, in order to ascertain the meaning of the words used in the instrument, must, when necessary, bé placed in the situation of the author of the instrument at the time of its execution, in the midst of all the circumstances which then surrounded him, and then -read the instrument in the light of these circumstances. In that way the meaning, where at all doubtful on the face of the instrument, may almost always be ascertained with unerring certainty; and this is especially the case where there is a latent ambiguity:—as, for instance, where a city or a bank is named in the instrument, without designating therein the state in which the city or bank referred to is located. And it turns out, as is very often the case, that there are cities and banks of the same name in other states and countries than ours. Here is a plain and common case for the introduction of extrinsic evidence to remove the ambiguity which extrinsic evidence has disclosed; and almost always such evidence does remove it beyond all controversy.
Applying these rules to this case, it is perfectly certain that the Bank of the Old Dominion in the city of Alexandria in the state of Virginia, is the place at which these notes, on their face, are payable. They are dated at “Alexandria.” They are payable at “Bank Old Dominion.” There is a Bank of the Old Dominion in the city of Alexandria, in the state of Virginia. These notes were discounted at that bank, *831 were presented for payment and were protested for non-payment at that bank. They, or some of them, were renewals of notes previously discounted at that bank. All the parties to the notes, makers and endorsers, resided and transacted business at the time of the discount of the notes in the city of Alexandria, Virginia; and the endorser was president of the Bank of the Old Dominion there, and had his place of business at the said bank. Is it not then perfectly certain that these notes, dated at “Alexandria,” and payable at “Bank Old Dominion,” were in fact payable “in this state?” Would not such have been the construction of these words had they been used in any will, deed, or other written instrument, executed by an author surrounded by the same circumstances?
But it seems to be supposed, that because these notes are made negotiable, it was intended that everything which affected the question of their negotiability should expressly appear on their face; so as to exclude all possibility of the existence of any extrinsic fact which would show them not to be negotiable. If the legislature had intended to make so great a difference as this between the construction of these and other written instruments, it would surely have said so in plain terms. But where is the necessity for such a difference? If parties choose to express their meaning in their notes in such words as to make it doubtful, without the aid of extrinsic eyidence, whether they were intended to be payable in this state, and therefore to be negotiable, this might make it necessary for parties to whom the notes were offered to be endorsed, to enquire, and satisfy themselves as to the fact of negotiability. This would, of course, make the currency of the notes more difficult. But that would be the only consequence. The notes being in *832 fact “payable in this state,” according to the legal rules of construction, they would be in fact negotiable,*; just as much as if the state were expressly named on their face. In this case there could have been no doubt in regard to the place at which the notes were payable. They were not made for general circulation,. pU£ for (discount at the Bank of the Old Dominion in Alexandria, Virginia, and it must have been perfectly well known by all the parties that they were payable in this state.
But they would have been negotiable had they been payable in another state, as the 11th section of the same chapter of the Code plainly shows. So that the omission of the name of the state on the face of the notes, could not possibly have affected or impaired the negotiability of the notes; and at most .could only have affected the question as to the extent to which the protest would be evidence on the trial of an action upon the notes. Surely so small a consideration would be insufficient to account for so radical a change in the rules of construction of written instruments in regard to this class of them, when such change is not expressly made by law, and if made at all, must be matter of mere inference.
I am therefore of opinion that the notes sued on in this case are “ promissory notes payable in this state at a particular bank,” within the meaning of section 7 of the chapter of the Code referred to, and the certificates of protest accompanying them are, prima fade, evidence of what is stated in them, as provided by the 8th section of the same chapter.
Upon the whole I am of opinion that there is no error in the judgment of the Corporation court for the city of Alexandria, and that it ought to be affirmed.
*833 Anderson J. James H. McVeigh & Son, of the city of Alexandria, Va., were the makers of seven promissory notes, amounting together to $16,500, which were made payable at the Bank of the Old Dominion, to ¥m. 1ST. McVeigh, who was then also a citizen of Alexandria. The notes are as follows: one for $2,500, bearing date March 30, 1861; one for $1,200, bearing date April 20,1861; one for $5,000, bearing date April 27, 1861; one for $800, bearing date May 11, 1861; one for $2,500, bearing date May 17, 1861; one for $2,000, bearing date June 8,1861; and another for $2,500, bearing date June 17, 1861; each payable ninety days after date, and maturing in July, August and September 1861. The last two were renewal of notes, and one of which, and the one of date May 17th, are alleged to have been made and discounted for the accommodation of the endorser. All the rest were made and discounted as accommodation notes, for the benefit of the makers. It is alleged that each of them was duly presented at maturity, demand made, and refused, and thereupon protested, and notice thereof given to the indorser. And this suit was brought by the Bank of the Old Dominion in August 1870, against the makers and endorser, to recover the amount of said notes, with interest and charges of protest.
Said notes were made and indorsed whilst the makers and indorser were residents of the city of A lexandria, before the beginning of the late war, or before the parties were separated by belligerent lines—except the two last. But before their maturity war was flagrant between the northern states and the state, of Virginia, which had withdrawn from the Federal Union, and had united with the Confederate States.
And long before the time when presentment and de *834 mand of payment is alleged to have been made and refused and protest, and the alleged notice to the indorser, the enemy had invaded and taken military 0CCUPati°n °f said city, to wit: on the 24th of May 1861; and James H. McVeigh and Wm. R. McVeigh had left the city, to wit: on the 30th of May, and gone the Confederate lines, with the knowledge of the officers of the bank (the family of the latter having preceded him), and neither of them had returned to Alexandria, but both remained within the Confederate lines during the war—¥m. R. McVeigh engaged in business in the city of Richmond, the capital of the Confederacy.
The record does not show the precise time when Edgar McVeigh, the son and partner of James H. McVeigh, left; whether before or after the departure of his father. But it is certified as a fact proved, that James H. McVeigh & Son were within the Confederate lines during the war.
The existence of war was recognized by the government of the United States more than a month before the invasion and military occupation of Alexandria. On the 19th of April 1861 proclamation of the blockade was made by the president. This was of itself conclusive evidence that a state of war existed. The Prize Cases, 2 Black’s R. 635; Cuyler v. Ferrill, 8 Amer. L. Reg., R. S., p. 100. In Bigler v. Waller & al., a Circuit court ease (Amer. L. Times Rep., vol. 3, Ro. 9, p. 159), Chase, C. J., delivering the opinion of the court, said: “ The actual beginning of the war against the United States doubtless preceded the proclamation of the president of 15th of April 1861, calling out the militia to suppress insurrection; but the proclamation declaring the blockade of the ports of the insurgent states, must be regarded as the first formal recognition *835 of the existence of civil war by the national government. That proclamation was issued on the 19th of April, and that date therefore must be taken as the date of the commencement of the war.”
It would be needless and a waste of time at this day to argue that the late conflict between the American states was a war, in the legal sense, with all the incidents and consequences of a war, as they are known to the international law, since it has been so held repeatedly by the highest Federal and State courts.
In Brown v. Hiatts, 15 Wall. U. S. R. 177, 184, Mr. Justice Meld says, speaking of the late war, “it is sufficient to state, that the war was accompanied by the general incidents of a war between independent nations; that the inhabitants of the Confederate States on the one hand, and the loyal states on the other, became thereby reciprocal enemies to each other, and were liable to be so treated without reference to their individual dispositions or opinions; that, during its continuance, all commercial intercourse and correspondence between them were interdicted by principles of public law, as well as by express enactments of congress; that all contracts previously made between them were suspended,” &c.
In Harden v. Boyce, Brady, J. said: “The following cases establish the proposition that in the late rebellion there existed between the government of the United States and the Confederate States a state of •civil war, in the sense of the international law, which brought with it the common incidents of war, and arrested all commercial intercourse and communication between the citizens of those states respectively. He cites the Prize Cases, 2 Black’s R. 635; The Venice, 2 Wall. U. S. R. 258; The Wm. Bagaley, 5 Wall. U. S. R. 377; Hanger v. Abbott, 6 Wall. U. S. R. 532; Allen *836 v. Russell, 12 Amer. L. Reg. 362. To which may be added Billgerry v. Branch & Sons, 19 Gratt. 425, and numerous other and more recent cases.
After the invasion of Alexandria, and its subjugation by the United States, although it was a city of Virginia, and claimed by the state to the last, its status and that of the Bank of the Old Dominion, and of all the inhabitants of the city, whatever might have been their individual dispositions or opinions, was that of hostility to the Confederacy and to the rest of Virginia which adhered to the Confederate government and to the inhabitants thereof. Billgerry v. Branch & Sons, supra; Brown v. Hiatts, supra, Mr. Justice Field; and the consequences and incidents of a war inter gentes applies to them. The foregoing propositions will hardly be controverted. With regard to them we are all of one opinion. They being conceded,
It is equally incontrovertible, that the McVeighs having cast their fortunes with the Confederacy, and thrown themselves under the protection of its government, to which they were giving aid and comfort, and living upon its territory, whilst the Bank of the Old Dominion remained on the United States side of the belligerent lines, within the power and under the government and control of that belligerent, it would have been unlawful for the makers to pay, or for the bank to receive payment from them of the notes in question at their maturity.
When the McVeigh’s abandoned their homes in Alexandria, after they had been overrun by the northern powrnr, and removed to keep within the Confederate military lines and under the Confederate flag, there can be no question which side they had espoused, the north or the south, the United States or the Confederacy; to which government they felt that their *837 allegiance was due, to which they were friends, and to which they were foes. It matters not whether they abandoned their residences in Alexandria with the in tention of returning or not. They evidently had no intention of returning as long as the city remained in the occupancy and under the dominion of the government of the United States waging war against their native State and the Confederacy. They were enemies to that government as long as it maintained the attitude of hostility and waged war against their country. On the other hand, the Bank of the Old Dominion adhered to the government of the United States. It remained on its side of the military lines, and continued subject to its power and control during the war; whilst the McVeigh’s, from the time they left Alexandria as before stated, continued subject to the government of the Confederacy as long as the war lasted. They were thenceforth, upon well established principles of international law, enemies.
It was not lawful for the makers, whilst this relation subsisted, to pay the notes in question, or for the holder to receive payment from them. There is perhaps no principle of international law in relation to wars inter gentes, better established than this. In Griswold v. Waddington, 16 Johns. R. 488, Chancellor Kent says, The idea that any remission of money may lawfully be made to an enemy is repugnant to the very rights of war. The law that forbids intercourse and trade must equally forbid remittances and payments. Payments or remittances of money by a subject or citizen of one belligerent to a subject or citizen of the other during the war is unlawful. See also Hoare v. Allen, 2 Dallas’ R. 102; Willison v. Patterson, 7 Taunt. R. 438; Conn. v. Penn., 1 Peters C. C. R. 496.
This principle has been repeatedly applied to our war. *838 Life Ins. Co. v. Hall, 7 Amer. L. Reg. 606; Coppell v. Hall, 7 Wall. U. S. R. 542, 557; Billgerry v. Branch & Sons, 19 Gratt. 397.
This being established, I hold that it was not lawful for the holder to demand payment, or to cause the' notes to be dishonored for non-payment. It could not pe lawful to demand of another what it is not lawful for him to pay or for you to receive.' And the makers, could not be held to be in default for not paying at maturity when the law forbade them to make payment and the holder to receive payment. In this I am sustained by this court in the case last cited. It follows that the protest was illegal and void.
Whilst demand of payment is not necessary where-the place of payment is named in the instrument, to give the holder right of action against the maker of the note, it is necessary to give him right of action against the indorser, and to fix his liability. The indorser by his contract, only undertook to pay the note in case it was not paid by the maker upon due presentment and demand and refusal, and upon due-notice thereof to him. They are precedent conditions, and unless complied with by the holder, there is no-contract or undertaking, by the indorser to pay the note. Edwards on Bills & Prom. Notes, pp. 265, 268. The holder is required to do two distinct acts in order to charge the indorser. Eirst, to make presentment and demand of payment of the maker; and if not paid, second, to give notice to the indorser of the dishonor of the note. Id. p. 483. In this case, we have seen, that it was unlawful for the makers to pay, or the holder to receive payment, by reason of their being separated as enemies by war; and therefore the makers could not be held in default for non-payment. A man cannot be held in default for not doing what *839 the law forbids. “ Mo default can arise from a complianee with the law.” And the indorser by his contract only undertook to be liable in case of the default of the makers. To hold him liable because of the nonpayment by the makers when by the intervention of , , • 1 i t i , , , . the war, which he did not create and was powerless to prevent, it was made unlawful, not to say criminal, for the makers to pay or the holder to receive, it seems to me, would be unreasonable, unjust, and arbitrary.
But if there had been a lawful demand on the makers, and protest of the notes in question, has there been due notice of their dishonor, so as to make the conditional undertaking of the indorser absolute and to fix his liability to pay them? It is true the protest states that notice was left at his residence in Alexandria, with his white servant, in all the cases except one, and in that one at the Bank of the Old Dominion, which is described as his place of business.
At the date of the first notice the existence of the war had been formally recognized by the government at Washington, more than two months, and at the date of the last it had been raging for nearly five months and a half; nearly as long as it took, in the late French and German war, to overthrow one of the most powerful empires in the world. And when those notices to McVeigh were left at his house, or the Bank of the Old Dominion, in Alexandria, they, together with the whole city had been in the military occupation of the enemy, and subject to its control and dominion for thirty odd days, to near five months, and had ceased to be the residence and place of business of Wm. M\ McVeigh, for about the same length of time; he being with his family, within the Confederate lines, and separated from them as by a wall of fire:
And this was known to the officers of the bank at the *840 time. How could such acts be regarded as notice to him? They were but idle forms.
Dean v. Nelson, 10 Wall. U. S. R. 158, was a proGeechug in Memphis, during the late war, whilst it was in the occupation of the United States, to foreclose a mortgage of shares of stock, which had been executed jjy Helson to secure a debt of which Dean, a northern citizen, was then assignee. A portion of the stock had been assigned by Nelson to Benjamin Day, and the residue to his wife, and they with Nelson were made defendants to the proceeding. All the defendants were then within the Confederate lines, and it was unlawful for them to cross them. Two of them had been expelled from the Union lines, and were not permitted to return. The other, Benjamin Day, had never left the Confederate lines. Held, that the notice was a nullity. Mr. Justice Bradly, speaking for the court, said: “A notice directed to them and published in a newspaper was a mere idle form. They could not lawfully see it, nor obey it. As to them the proceedings were wholly void and inoperative. How much better would have been a notice left at their late residence or place of business in Memphis?”
In a recent case decided by the Superior court of Chicago (Life Ins. Co. v. Hall & al., 7 Amer. L. Reg., new series, p. 606), it was held that the publication of notice in a newspaper in Chicago, of a suit depending in that city, addressed to parties residing in Louisiana, within the Confederate lines, during the late war, has no validity, and is void. The court said: “ The only principle upon which it could be justified would be, that the debtor, being an enemy, had no rights which a court of justice was bound to respect.” To divest a man of his rights or property on such a notice, the court says, “could rest only on a basis of robbery.” *841 How much better would be a notice left at his abandoned place of business or residence then in the hands of his enemy?
The New York case of Harden v. Boyce (59 Barb. Supr. Court R., p. 426) is still more directly in point. That was an action against the indorser of a negotiable note made in New York October 1st, 1860, and payable at the Bank of the Republic twelve months after date. The note at maturity, in October 1861, was presented at the Bank of the Republic, and payment demanded and refused, and thereupon protested. Hotice of the dishonor of the note to the defendant, the indorser, who was a resident of Greenville, South Carolina, and within the Confederate lines at the date of the protest, was deposited in the post office, directed to him at his residence. It was held that the notice was a nullity. Brady, J. who delivered the opinion of the court, in a very clear and condensed opinion, says:
“When a war is commenced between nations it arrests eo instanti all commercial intercourse and voluntary communication with the enemy without permission of the government; and the citizens or subjects of one belligerent become the enemies of the other, and of all its citizens or subjects.” (Citing Griswold v. Waddington, 16 Johns. 438; The Rapid, 8 Cranch 161; and The Julia, Id. 193.) “And these results of war inter gentes (he says) were substantially applied to the citizens of the Confederate States during the late war.”
Then referring to numerous cases sustaining this proposition he thus concludes: “The existence and character of the hostilities mentioned, and the consequences flowing therefrom, rendered the attempted service of notice of protest on the defendant a nullity.
The defendant’s engagement was a conditional one, to be made absolute upon the observance of such for *842 mulse as are prescribed by law, unless waived or-rendered unnecessary by facts and circumstances attending the maturity, demand and refusal, of paymenf recognized by commercial .law. In this caso there was no pretence that notice of dishonor had been waived or was necessary (unnecessary), and the defen(jarit was therefore entitled to it. The plaintiff' was under no obligation to send it as long as the impediment occasioned by war existed. * * * It was his duty, however, to send it when the interruption of intercourse ceased.” And such is declared to be the law by Chitty and Edwards. Edwards on Bills and Promiss. Notes, 458-9. See also 8 Wend. R. 488; 6 East’s R. 16.
I think it must then be conceded, upon reason and authority, that the attempted service of notice on theindorser in this case was wholly inoperative and void; and that to fix his liability, in other words, to make-absolute his conditional contract to pay the notes, it was necessary that the holder should have notified him of their dishonor in a reasonable time after the impediment was removed, by the termination of the war.
This conclusion is irresistible unless it can be successfully maintained, that Wm. H. McVeigh by abandoning his residence and place of business in Alexandria to keep within the Confederate lines and under the protection of the Confederate government, forfeited his right to notice and made his contracts absolute.
He violated no condition or requirement of his contracts, expressed or implied, by removing from his-residence and place of business in Alexandria before the maturity of the notes,—nor did the makers. If he-(the indorser) chose to leave Alexandria and remove to any part- of Virginia, or to another State, or beyond the seas, he would thereby have violated no obligation *843 of his contract. And it would have been necessary for the holder to have followed him with notice of the dishonor, in order to hold him liable, if he knew where he was, or could find out by reasonable inquiry, and due diligence. Story on Promis. Notes § 316. Wm. N. McVeigh, like Benjamin Day, in Dean v. Nelson supra, never left the Confederacy. He was in the Confederacy when the war commenced, at the place where the notes were made, indorsed and payable, and like Day he never left it.
It was not leaving his home and place of business, which he had a right to do under his contract, which prevented its execution, or caused its suspension. It was the war, for which he was not responsible, and which he doubtless regarded as a great public calamity. ' But as it had burst upon the country it threw upon him, as it did upon others, the necessity of deciding questions of duty and responsibility for himself as a citizen. It was a war which divided states and communities, and individuals, that were before under one common federal government. But these individuals were also amenable to their local state governments, which still retained their powers of sovereignty, except only so far as they had delegated a part of them to the general government by the bond of union. To their respective state governments the citizens of each owed allegiance, qualified only by the powers which had been delegated to the common government. In this unhappy conflict between states and sections the citizen had to decide for himself, on which side of the conflict his duty placed him. And it being a civil war, and having been previous to the removal of the McVeighs from Alexandria, recognized as such by the government at Washington, the citizen had the right of election, to which side he would *844 adhere. It was so held by the Supreme court of the U. S. Inglis v. Trustees of the Sailor’s Snug Harbor, 3 Peters R. 99. Mr. Justice Thompson delivering in the the court says, “This right of election must necessarily exist in all revolutions like ours, and is so well established by adjudged eases, that js entirely unnecessary to enter into an examination of the authorities.” Mr. Justice Story, who dissented from the opinion of the court on some points, concurred on this point. He says, “Under the peculiar circumstances of the revolution, the general, I do not say the universal, principle adopted was, to consider all persons, whether natives or inhabitants, upon the occurrence of the revolution, entitled to make their choice, either to remain subjects of the British crown, or to become members of the United States.” (The italics are mine). Again he says, “It appears to me that there is sound sense and public policy in the doctrine, and there is no pretence to say that it is incompatible with the known law, or general usages of nations.”
But the decision of this question is not necessary to the decision of this cause. For if in a political aspect the McVeighs had not the right of election, and were guilty of an offence against the public in electing to go with the Confederacy, for which they might be held responsible in a prosecution, they cannot by reason thereof be held liable to this private party beyond their undertaking in the contract.
It seems that McVeigh elected to adhere to his native state of Virginia, which had withdrawn from the Federal union and united with the Southern Confederacy. And earnest and deep and overpowering must have been his convictions of duty to have impelled *845 him to so great a sacrifice of property, comfort, and material prosperity, as he made by this decision.
It is not like the case of a man absenting himself from his home, or absconding, to evade notice, or to avoid a just responsibility. Wm. H. McVeigh by leaving, sacrificed large pecuniary interests and left a valuable estate at the mercy of the invader. It cannot be doubted, that he was impelled to this great pecuniary sacrifice by a high sense of duty and moral feeling; like thousands of as generous, virtuous, honorable and patriotic men, as ever lived in any age or in any land—many of whose names, by their exalted virtues, will adorn the annals of time till time shall be no more. Ho one will be disposed to attribute ignoble motives to Wm. H. McVeigh, or McVeigh & Son, whether they regard them as right or wrong in their convictions; a question which it is not necessary to decide, and which it would be futile and to no purpose to investigate in this opinion.
As McVeigh violated no requirement nor condition of his contract, to hold that he forfeited it to the bank by an infraction of a public duty would be tantamount to subjecting him to confiscation, not to the government, but to a private party to a contract which he had not violated; a conclusion which must be repulsive to every fair mind. If he were liable to this sort of punishment or forfeiture, how would it be with those Confederates who did not recede before the advancing armies of the United States, but met them, and invaded their territory?
I cannot see that the McVeighs differ from all other non-combatant Confederates who were hostile to the United States as a power that was waging war against their state. They did not leave their country to carry on hostilities against it. And if they had, the public of- *846 fence could not create an obligation on tbe part of Wm. ,T ljr ^ . , , . _ _ _ . _ JN- McVeigh, to pay to a private party a debt which his contract did not bind him to pay. He did not leave kis state. He elected to adhere to the Confederacy in the conflict of arms, and endeavored to keep within . .-..j .. , , , . its military lines and under the protection of its flag. jf pe were wrong, it could not entitle a private party to coerce him to pay further than his contract bound him. Nor can we say that the McVeighs of their free will abandoned their homes in Alexandria. It cannot justly be said, that a man voluntarily does that which if he did not do he would be in danger of loss of life or liberty from a power which it was impossible for him to resist, or be required to subject himself to moral degradation. Such the McVeighs most probably regarded the alternative presented to them. And if so, though they were mistaken, it cannot be said that they voluntarily abandoned' their homes.
But however Wm. N. McVeigh’s removal from Alexandria may be regarded as a political question, in that respect we have nothing to do with it. We have seen that by his removal he violated no part of his contract with the holder of the notes in question, and that if guilty of an infraction of a public duty that could not create siu him a private obligation to pay money to the holder which by his contract he is not liable to pay. He is not asking aid of the courts to relieve him from the operation of legal proceedings, or from the effect of his absenting himself from his home. And in this there is a broad distinction between our case and Ludlow v. Ramsey.
I am further of opinion, that the court erred, in overruling the motion for a new trial, the verdict being plainly contrary to the law, as herein expressed, and to the first and second instructions given by the *847 court for the defendant. It is said that the McVeighs had not been domiciled in Virginia outside of the Union lines, because they left their homes in Alexandria with the intention of returning. Let it be that they did—that they expected the enemy would be expelled, and they would be able to return even before the maturity of their notes. They were grievously ■disappointed. They found that at the date of the maturity of these notes, and before and afterwards, as long as the war lasted, there was an impassable barrier between them and their former homes in Alexandria and the holder of these notes. But did we not hold, in jHutchison v. Taylor, 25 Gratt. 586, Judge Christian delivering the opinion, that Hutchison had changed his domicil, and become domiciled in Virginia although he may have left Washington with the intention of returning ? and that he and his partner Taylor, who remained in Washington, thereby became enemies; and upon that ground that the partnership was dissolved ? One rule ought not to be applied to Hutchison, and a different rule to McVeigh, under •substantially the same circumstances.
As well might it be held that General Lee had not ■changed his domicil, and that a notice left at Arlington after it fell under the dominion of the enemy, as his place of residence, was a good service, as to hold that the notice was good in the case before us. He brought his family away; but suppose he left furniture, books, papers and, servants too, as I think he did, would that validate the notice?
The grave question for this court to determine, is the legal liability of Wm. N. McVeigh under these contracts as indorser. And if it were a fact that orphans and widows would be affected by our decision, and I do not know whether they will or not, I am at a *848 loss to know what aid it can give us in coming to a right conclusion. If Wm. U. McYeigh is not liable to pay them by his contract, as implied by his indorsation, according to commercial law and usage, there is no obligation on him, moral or legal, to pay them, even though orphans and widows had an interest in them. He only undertook to pay them, as we have seen, on the compliance of the holder with certain precedent conditions, one of which was due notice of their dishonor. And in as much as the holder could not comply with that condition by reason of the war, the contract was suspended, and the holder was excused from giving the notice until the impediment was removed, which, in this case, was the termination of the war. In such ease Chief Justice Marshall says, in Hopkirk v. Page, 2 Brock. R,. 20-84 : “ To charge the drawer, notice of the dishonor of his bill ought to be given within a reasonable time after the removal of the impediment.”
Hotice to the indorser cannot be presumed, as has been contended, from the fact of payment to the branch bank during the war in Confederate money. The payment was made by the makers, and accepted by the branch of the Bank of the Old Dominion on the 30th of May 1864. The makers, of course, then knew that they had not been paid. And if the fact of payment was communicated to the indorser, which is also probable, the inference for him was plain that they had not been previously paid. But it is not fair to presume from that fact that he inferred, or had reason to believe, that they had been protested at maturity, when he knew that no demand of payment had been made, or could have been made. It was natural that the makers, knowing that the notes were not paid, would avail themselves of the authority given by the *849 act of assembly in such cases to pay them, if they had the means to pay them, and the branch bank was willing to receive payment in such currency as all the other banks of the commonwealth were receiving.
No presumption can be l’aised from this fact, in connection with the fact, that subsequently, said act of assembly was held to be unconstitutional by a majority of this court, so far as it authorized payments to be made in such cases to the branch bank, that the indorser knew in a reasonable time after communication was restored by the termination of the war or had any reason to believe, that said notes were unpaid, and that the bank looked to him for payment. That decision was made more than five years after the termination of the war; and until then no judicial doubt, had ever been suggested, as to the constitutionality of the law, or as to the validity of payments made by its authority. But it had received high judicial approval and sanction as far as it had been passed on by the courts.
No notice had been given to the indorser by the mother bank within a reasonable time after the termination of the war, that she repudiated the payment made by the makers of her branch, and looked to him for payment. But on the contrary, as soon after the war as the fall of 1865, the mother bank appropriated all the assets to her branch, including the proceeds of the payment made by the makers of these notes, without even an offer, so far as this record shows, to return to the makers the value of the Confederate money paid by them, or to credit it on their notes.
So far from these facts raising a presumption, that the indorser had notice in a reasonable time, after the termination of the war, and the restoration of com *850 munication between bim and the bank, that the notes in question had not been paid, and that they had been dishonored, and that the bank looked to for Payment, the presumption is the other way. They raise a strong presumption amounting in fact to an assurance, that the notes were discharged, and that tfje kan]£ ¿id aot loot t0 him for payment. Judge Marshall says, in Ogden v. Saunders, 12 Wheat. R. 213 -14, “ He,” meaning the drawer, “ has a right to expect notice of its non-performance, because his conduct may be materially influenced by this failure of the drawee. He ought to have notice that his bill is disgraced, because this notice enables him to take measures for his own security.” The same is applicable to the indorser of a note. And if Wm. H. McVeigh had received due notice of the non-payment of the notes, and that the bank looked to him for payment, he might have taken measures for Ms security.
But it is said, it was the duty of the indorser to have made inquiry himself, of the holder of the notes whether they had been paid, or whether they had been dishonored and he was looked to for payment, and that inasmuch as he did not do so he is liable to pay. This, it seems to me, would introduce a new principle into the commercial law, and totally change the character of an indorser’s contract, as it has already been explained. The fact that the indorser was the president of the bank cannot affect the question of his liability. He stands precisely upon the footing, as to his rights and liabilities that he would if he were not president, and can be held liable no further than his contract makes him liable. Bid we not hold but recently, in a case decided at Staunton, and not yet reported, Christian J. delivering the opinion, in which *851 we all concurred, the case of Tardy v. Boyd, that Boyd as indorser was discharged from liability to pay the debt, for want of notice of its dishonor, although he was a director of the bank, and afterwards offered to pay it in Confederate money? But McVeigh in fact ceased to be president of the hank before any of these notes matured; was never afterwards privy to its proceedings, and was cut off from all communication with it.
"With regard to the instructions, as this opinion has already occupied so much of our time, I will only say, that so far as the instructions are in harmony with the principles herein declared, they are proper to be given to the jury, and so far as they are in conflict with them, they ought to be refused.
I am of opinion upon the whole to reverse the judgment of the court below with costs, and to remand the cause, to be proceeded with in conformity with the principles herein declared.